# Illinois Official Reports

## Appellate Court

---

> ### *In re Jason B.*, 2020 IL App (1st) 200356

---

| | |
|---|---|
| Appellate Court Caption | *In re* JASON B., a/k/a Jayson B., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellee, v. Taniya C., and Ladale B., Respondents-Appellees). |
| District & No. | First District, Fourth Division<br>No. 1-20-0356 |
| Filed | November 25, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 19-JA-1066; the Hon. Bernard J. Sarley, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Charles P. Golbert, Public Guardian, of Chicago (Christopher Williams, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Victoria L. Kennedy, Assistant State's Attorney, of counsel), for the People.<br><br>Marv Raidbard, of Skokie, for other appellee. |
| Panel | JUSTICE HALL delivered the judgment of the court, with opinion.<br>Justices Lampkin and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    This appeal arises from an order of the trial court that dismissed the petition for adjudication of wardship for minor Jason B. on the State's motion. The public guardian, representing the minor, contends on appeal that such dismissal was against the manifest weight of the evidence and should be reversed, as it was not in the minor's best interests to have the petition dismissed because his physical safety is at risk. The public guardian additionally contends that ample probable cause exists to believe that the minor was abused and neglected. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3    The record reveals that four-year-old Jason B. was born on May 15, 2016. On September 25, 2019, Jason B. and his six-month-old cousin D.B. came to the attention of the Department of Children and Family Services (DCFS) after D.B. was diagnosed with numerous bone fractures that were suspected physical abuse.

¶ 4    The State filed a petition for adjudication of wardship on that date, which alleged that Jason B. lived with his mother, Taniya C.; his father, Ladale B.; his cousin, D.B.; D.B.'s mother, Twanette C.; and his grandmother, Regina A. (Taniya and Twanette's mother). D.B.'s father was incarcerated at the time. The petition further alleged that Jason B. was neglected, based on an injurious environment, and abused, based on a substantial risk of physical injury. As factual support for the petition, the State alleged the following:

> "Maternal grandmother, an aunt and cousin reside with this minor and his parents. Maternal grandmother has one prior indicated report for brain damage/skull fracture and subdural hematoma. All adult family members who reside in the home are caretakers for this minor and minor's cousin. On September 18, 2019[,] this minor's cousin presented at the hospital and was diagnosed with multiple fractures. Maternal grandmother threatened hospital staff and her visitation for this minor's cousin was restricted. Medical personnel state minor's cousin has a femur fracture, rib fracture and two skull fractures which are in different stages of healing. There was a delay in seeking medical attention. Minor's caretakers provided inconsistent explanations as to how this minor's cousin was injured. Medical personnel opine that minor's cousin['s] injuries are due to non-accidental trauma. Parents and other family members who reside in the home are refusing to cooperate with DCFS and police personnel. On or about September 23, 2019[,] family members removed this minor from a safety plan and refuse to disclose his current address."

¶ 5    The State also filed a motion for temporary custody, which alleged that there was probable cause that Jason B. was a neglected and abused minor, as detailed in the Petition for Adjudication of Wardship. The motion further alleged that reasonable efforts could not prevent or eliminate the necessity of removing Jason B. from his home.

¶ 6    The hearing on the State's motion for temporary custody was held on September 25, 2019. Jason B's mother was present, but his father was not. The court appointed an attorney for his mother and appointed a guardian *ad litem* (GAL) for Jason B. At the conclusion of the hearing, the court entered findings that probable cause existed to find Jason B. an abused and neglected minor as alleged in the petition for adjudication of wardship. The court also found that

immediate and urgent necessity existed to support the removal of Jason B. from the home, and he was placed in the temporary custody of the DCFS guardianship administrator. The court's findings were entered without prejudice.

¶ 7        The following day, the court appointed an attorney for Jason B.'s father and ordered him to submit to parentage testing. Both mother and father were also granted limited supervised visitation of Jason B.

¶ 8        On October 7, 2019, the parties proceeded by way of stipulation on a hearing on the petition for adjudication of wardship, and the court entered findings that probable cause existed and that Jason B. was an abused and neglected minor as alleged in the petition. The court further found that immediate and urgent necessity existed to support Jason B.'s removal from the home, and he was again placed in the temporary custody of the DCFS guardianship administrator. This time, the findings were entered with prejudice to Jason B.'s mother and father.

¶ 9        On November 13, 2019, the State filed a motion to voluntarily dismiss the petitions without prejudice for both Jason B. and D.B. In support of its motion, the State indicated that, since the filing of Jason B.'s petition, newly discovered evidence was obtained. Specifically, the State learned, on or about October 29, 2019, through a genetic testing report for D.B., that D.B. had a genetic marker for osteogenesis imperfecta. Osteogenesis imperfecta is a genetic disorder characterized by fragile bones that are prone to fracture. After receiving the report, the State made all necessary efforts to assess the implications of the testing results, including speaking with medical personnel who opined that, given the genetic testing results, D.B.'s injuries were consistent with his diagnosis of osteogenesis imperfecta and not non-accidental trauma.

¶ 10       On November 15, 2019, over the objection of the GAL, the court found that probable cause existed to find that Jason B. was an abused and neglected minor, but that no immediate and urgent necessity existed to support his removal from home. The court concluded that it was within Jason B.'s best interests to be returned to the custody of his parents. The court issued an order of protection pursuant to section 2-25 of the Juvenile Court Act of 1987 (705 ILCS 405/2-25 (West 2018)), returning Jason B. to the care and custody of his parents.

¶ 11       The hearing on the State's motion to voluntarily dismiss its petitions was held on November 22, 2019, and was subsequently continued for hearing on the following dates: November 26, 2019, December 4, 2019, December 17, 2019, and December 20, 2019.

¶ 12       Prior to the commencement of the hearing, Jason B.'s GAL objected to the State's motion to dismiss the petition and requested an evidentiary hearing pursuant to the holding of *In re J.J.*, 142 Ill. 2d 1 (1991). The GAL also made an oral motion to amend and offer a supplemental petition for Jason B. to add grounds and factual support of physical abuse and also asked the court to reconsider its decision to allow Jason B. to return home under the order of protection over the GAL's objection. The GAL indicated that he had black and white photographs of a mark on J.B.'s buttocks but could not print color copies because there were problems with the only color copier in the public guardian's office.

¶ 13       At the evidentiary hearing, the public guardian first called Dr. Annie Torres to testify. Dr. Torres, a child abuse pediatrician at Stroger Hospital, testified that she evaluated D.B. on September 18, 2019, after he was brought to the hospital with a femur fracture, two skull fractures, and rib fractures. In evaluating D.B.'s injuries, Dr. Torres spoke with Twanette and Regina regarding the history of his injury, examined D.B., reviewed the radiology reports, and recommended additional testing and labs. Regina told Dr. Torres that D.B. fell off the bed at

6:00 p.m. the previous evening and that he was brought to the hospital at 1:00 p.m. the following day. D.B.'s injuries were a left transverse displaced femur fracture; asymmetric, bilateral skull fractures; a posterior fifth rib fracture; a possible second healing rib fracture in his back; and a hematoma over his left temple. Dr. Torres was concerned that D.B.'s injuries were caused by physical abuse because a short fall from a bed would not have caused such severe injuries.

¶ 14 D.B. was tested for osteogenesis imperfecta (OI), based on his father's medical history, as relayed by Twanette. Dr. Torres testified that OI is a genetic condition that causes poor mineralization of bones, which makes the individual more susceptible to bone fractures. On October 23, 2019, the genetics test results indicated that D.B. had a gene mutation associated with OI. While long-bone fractures such as D.B.'s displaced femur fracture are typical fractures associated with OI, his rib and skull fractures were not. Dr. Torres further testified that she would expect a child with a displaced femur fracture to experience immediate pain and discomfort and his caregivers would have noticed that he was uncomfortable with normal handling. Dr. Torres believed that D.B.'s caregivers delayed bringing him to the hospital.

¶ 15 Dr. Torres initially called DCFS due to D.B.'s multiple fractures in various stages of healing. When she learned that D.B. tested positive for OI, she notified the involved parties of his condition, noting that his femur fracture was consistent with OI but that his skull and rib fractures were considered indeterminate, and she could not exclude abuse.

¶ 16 On October 26, 2019, D.B. was hospitalized with three new fractures to his left leg. Dr. Torres opined that these fractures were likely caused by his OI.

¶ 17 Dr. Torres also testified concerning Jason B., who was also examined by an emergency room physician on September 18, 2019. On September 25, 2019, Dr. Torres spoke with the physician who examined Jason B. The physician expressed concerns that the examination indicated suspected child abuse. The written report diagnosed Jason B. with suspected child abuse, and a health works services encounter form completed by the examining physician stated that Jason B. had marks on his chest and buttocks, as well as developmental and speech delays.

¶ 18 Dr. Torres also examined a photograph of Jason B., taken during his examination, showing that he had a "linear hyperpigmented mark on his left buttock," which had the appearance of a line and was most likely from an inflicted injury. She testified that it was possible that the mark on his buttock was from a belt but could not say definitively. Other photographs indicated marks on Jason B.'s chest, which Dr. Torres could not determine were bruises or an unusual birthmark. She described the marks on his chest as "nonspecific" and "concerning," warranting a history. Dr. Torres was unable to obtain a history concerning the marks because no caregiver was present and Jason B. was nonverbal. She was also unable to date the injuries, other than to say that the injuries were not acute. Jason B. did not return to Stroger Hospital for a follow-up examination. Dr. Torres called the DCFS hotline based on the mark on Jason B.'s buttock.

¶ 19 DCFS child protection investigator Yenni Rojas[1] testified that, on September 18, 2019, she was assigned to investigate an allegation of abuse for bone fractures concerning D.B. and substantial risk concerning Jason B., due to his residing in the same household as D.B. Rojas clarified that there was no pending investigation for Jason B. on that date; rather, Jason B.'s investigation was initiated on September 23, 2019. She was not aware of any hotline calls

_____

[1]Also referred to in the record as "Yani."

between September 18 and September 23, 2019, concerning Jason B., nor did she contact the hotline during that period.

¶ 20    During her investigation, Rojas learned of a prior investigation involving Regina, Taniya C., and Ladale B. Rojas testified that, in May 2019, there was a physical abuse allegation made against Ladale B. which was investigated by a different investigator. Upon reviewing the documentation, Rojas learned that Ladale B., who had mental health diagnoses of bipolar disorder with psychosis and cannabis disorder, indicated that he hit Jason B. with a belt while on the way to a mental health court appointment. The documentation did not include Jason B.'s body chart, nor did it indicate that the investigator looked at the child's body, other than when removing his shirt, nor did the documentation indicate that Jason B. was examined by a doctor. That report was unfounded, meaning that DCFS determined that there was no credible evidence to support the allegation. Additionally, Rojas testified that she learned from her supervisor that Regina had a report from 17 to 19 years prior concerning a skull fracture to another child.

¶ 21    Rojas further testified that, on September 18, 2019, she met D.B. at the hospital, and she met Jason B. at home. She spoke with Twanette in D.B.'s hospital room; Twanette stated that she had left home between 3 and 4 p.m. and was not present when D.B. was injured. While investigating, Rojas spoke with Regina, Taniya C., and Ladale B. separately. Regina told Rojas that she cared for both D.B. and Jason B. and indicated that D.B. fell off the bed in her bedroom.

¶ 22    Taniya C. stated that she and Ladale B., who also lived in the home, were sleeping all day and did not know how D.B. was injured. Ladale B. was hesitant to answer questions about D.B., although he stated that D.B. was not at home on September 17, 2019, at which point Regina screamed at him to "be quiet" and to not say anything because she already made a statement about what happened. Taniya C. denied that Jason B. was abused, while Ladale B. did not really respond to questioning, but instead became upset, started cursing, and closed the door in Rojas's face. Rojas wanted to institute a safety plan for Jason B. and move him to a different caregiver, based on the inconsistent information she received from the adult household members and because D.B. had serious injuries. Ladale B. did not agree to the safety plan, and he yelled that "nobody was going to take his son."

¶ 23    Later, on the same date, Regina stated that she located a neighbor (Mary F.) to temporarily care for Jason B. for no more than seven days. When Rojas went to Mary F.'s home on September 23, 2019, to take protective custody of Jason B., the child was not there. Mary F. admitted that Jason B. was never with her. Mary F. stated that right after Rojas left on September 18, 2019, Taniya C. and Ladale B. retrieved Jason B. and that she was "threatened" to pretend that the child was with her.

¶ 24    Rojas, along with police officers, searched for Jason B. in Regina's home. Regina first stated that she did not know where Jason B. was and refused to allow them to look for him. Later, Regina stated that Jason B. was with another caregiver, whom Rojas had ruled out because he did not pass placement clearance, and then stated that she did not know where Jason B. was. Taniya C. also told Rojas that she did not know where Jason B. was before saying that he was with the same caregiver that did not pass clearance.

¶ 25    After being taken into protective custody on September 25, 2019, Jason B. was taken to Stroger Hospital for a health works examination, which was protocol for minors taken into DCFS care. Rojas spoke with Dr. Torres on September 27, 2019, who related her concerns regarding the marks on Jason B.'s body and indicated her concern that the marks were the

result of inflicted injury. Rojas did not conduct a full physical examination of Jason B., but mentioned a small bruise near his ankle. Rojas testified that Jason B.'s investigation was indicated for substantial risk and physical abuse because of D.B., medical personnel's determination that the marks were inflicted, and the inconsistent information from and lack of cooperation by the parents.

¶ 26    Regarding D.B., Rojas spoke with the hospital social worker, the nurse, the treating physician, and Dr. Torres. D.B.'s case was indicated for abuse and neglect, even though Rojas learned that D.B. had OI. Despite this information, Rojas indicated the report due to D.B.'s skull and rib fractures, which were identified by Dr. Torres as being inconsistent with OI. Additionally, Rojas cited the delay in seeking medical attention and the replacement with Regina, a caregiver who had prior indications of abuse, as well as the inconsistent statements regarding D.B.'s injuries. Rojas testified that (1) she was also concerned by the "erratic behavior" of respondent-father and Regina when she went to look for J.B., (2) she did not know if respondent-father had received mental health treatment, as was indicated in the case file, (3) she was concerned by the family's violation of the safety plan and that they hid J.B., and (4) she also had concerns that all of the adult household members refused to test for illegal drugs as required in the service plan. Rojas was also aware that D.B. sustained further fractures in October 2019. On cross-examination, Rojas testified that neither Taniya C. nor Twanette had previous child neglect or abuse allegations in their history.

¶ 27    Jasmine Noggins, a DCFS caseworker assigned to D.B.'s case also testified primarily about D.B.

¶ 28    Taniya C. called Jason B.'s DCFS caseworker, Germalina Rambo-Harris, who testified that, on November 15, 2019, Jason B. was returned to respondents' care and custody under an order of protection, after she investigated and found no problems with the home. Rambo-Harris visited Jason B. three times since he was returned home in November. Taniya C. was present during each visit. She described the interactions between Jason B. and his mother as very comfortable and indicated that Jason B. did not want to leave his mother's side. Rambo-Harris described Jason B. as happy and indicated that he did not exhibit any fear toward Taniya C. Rambo-Harris had no concerns about Jason B. remaining with his mother and indicated that Jason B. even "sang a song" that she "wasn't going to remove him." Taniya C. indicated that she would make a doctor's appointment to follow up on the marks on the child's body. Rambo-Harris did not see any evidence that Ladale B. lived in the home, and she testified that it would be in Jason B.'s best interest to remain with his mother. She also testified that Jason B. was bonded to Regina and that Regina's interaction with Jason B. was loving.

¶ 29    On cross-examination, Rambo-Harris testified that Ladale B. said he lived in Maywood, but she had not confirmed it. He was not at the home the two times she made unannounced visits. Rambo-Harris was unaware of whether he had contact with Jason B. and had not discussed it with Taniya C. Prior to November 15, 2019, Rambo-Harris learned that the most recent investigation for Jason B. was "indicated," but she was confused as to how it was unfounded and subsequently indicated. She was unable to evaluate Ladale B. as a safety risk and was not in agreement with Jason B. being returned to his parents under an order of protection.

¶ 30    Ladale B. was not present in court, and his counsel did not present any evidence.

¶ 31    The trial court found that it was in Jason B.'s best interest to dismiss the petition and grant the State's motion. The court indicated that it reviewed the evidence prior to arguments a few

times and noted that its initial impression of what the appropriate ruling was did not change with regard to Jason B.

¶ 32 The trial court issued its ruling on December 20, 2019. The court noted that probable cause originally existed because Jason B. resided at the home where D.B. was the subject of suspected physical abuse prior to the medical diagnosis. The court specifically addressed the alleged injuries to Jason B., which were investigated in May 2019 and determined to be unfounded in June 2019. The court noted that there was not anything significant from May through October 2019 regarding the marks, and acknowledged that Dr. Torres reviewed photographs of the marks, did not examine Jason B., and was unsure of the marks' origins. The court found that the argument concerning the marks was "more of a bootstrapping of these marks onto the alleged neglect of [D.B.] I don't think is proper in this case." The court found that there was no probable cause that Jason B. was abused or neglected and that it was in his best interests to return Jason B. to the care of his parents.

¶ 33 The court then granted the State's motion to dismiss Jason B.'s adjudication petition and denied the motion to dismiss D.B.'s adjudication petition. The court denied the public guardian's motion to vacate the November 15, 2019, order of protection returning Jason B. to his parents' custody, as well as the public guardian's motion to supplement the adjudication petition with a physical abuse allegation. The public guardian's request to stay the order dismissing Jason B.'s petition was also denied.

¶ 34 The public guardian filed a motion to reconsider on January 15, 2020, which was denied by the court, indicating that its original reasoning had not changed.

¶ 35 This timely appeal followed.

¶ 36                                            DISCUSSION

¶ 37 On appeal, the public guardian, on behalf of Jason B., contends that the dismissal of the adjudication petition was against the manifest weight of the evidence and should be reversed as it was not in the minor's best interests to have the petition dismissed because his physical safety is at risk. The public guardian additionally contends that ample probable cause exists to believe that the minor was abused and neglected, as supported by the record.

¶ 38 The Juvenile Court Act sets forth the process by which a court will decide whether a child shall be removed from his or her parents and made a ward of the court. *In re Ashli T.*, 2014 IL App (1st) 132504, ¶ 12. In all proceedings under the Juvenile Court Act, the best interest of the child is the primary concern of the court. *In re Ashley F.*, 265 Ill. App. 3d 419, 424 (1994).

¶ 39 The State may initiate proceedings by filing a petition alleging that the minor is abused or neglected and that it is in the minor's best interest to be adjudged a ward of the court. 705 ILCS 405/2-13 (West 2018). When a petition is filed, the court shall order a temporary custody hearing to determine who will be granted temporary custody of the minor until a determination can be made as to whether the minor should be adjudged a ward of the court and placed in the custody of someone other than the minor's parents. 705 ILCS 405/2-10 (West 2018); *Ashli T.*, 2014 IL App (1st) 132504, ¶ 12. The additional hearings consist of an adjudicatory hearing, a dispositional hearing, and a permanency hearing. *Ashli T.*, 2014 IL App (1st) 132504, ¶ 12.

¶ 40 At the temporary custody hearing, the court makes a threshold determination as to whether the minor is abused or neglected. *Id.* If the court finds there is probable cause to believe that the minor is abused or neglected, then it must conduct a hearing at which all relevant parties

shall testify. 705 ILCS 405/2-10(2) (West 2018). Following such hearing, the court may release the minor into the custody of a parent, guardian or custodian; release the minor pursuant to a protection order; or prescribe shelter care and order that the minor be kept in a suitable place designated by the court or a shelter care facility. 705 ILCS 405/2-10(2) (West 2018). Once a temporary custody order has been made, any party may file a motion to modify or vacate the order. 705 ILCS 405/2-10(9) (West 2018).

¶ 41     At the adjudicatory hearing, the court shall determine whether the minor is abused or neglected (705 ILCS 405/2-18 (West 2018)); if the court finds that the minor is abused or neglected, the court must conduct a dispositional hearing pursuant to section 2-22 of the Juvenile Court Act (705 ILCS 405/2-22 (West 2018)) to determine whether the minor should become a ward of the court (705 ILCS 405/2-21(2) (West 2018)). At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court; if so, the court shall enter a disposition order which serves the health, safety and interests of the minor and the public. 705 ILCS 405/2-22(1) (West 2018). If the minor is made a ward of the court due to abuse or neglect, the court may enter a dispositional order that continues custody to the minor's parent(s), guardian, or custodian; that places the minor in legal custody or guardianship; that restores custody to the minor's parent(s), guardian, or custodian on condition of compliance with an after-care plan; or that partially or completely emancipates the minor. 705 ILCS 405/2-23(1)(a) (West 2018). Any disposition order may provide for protective supervision or include an order of protection. 705 ILCS 405/2-23(2) (West 2018).

¶ 42     In this case, the State initiated proceedings by filing a petition for adjudication of wardship for Jason B. and a motion for temporary custody, alleging that there was probable cause to believe that Jason B. was abused and neglected based on an injurious environment due to the alleged physical abuse of D.B., who resided in the same household. At the temporary custody hearing, the trial court found probable cause to believe that Jason B. was abused and neglected and that there was an immediate and urgent necessity to remove him from the home, and granted temporary custody to DCFS. Subsequently, the State moved to dismiss the adjudication petition, contending that there was newly discovered evidence that D.B. suffered a medical condition as opposed to child abuse, and the State's motion was granted after an evidentiary hearing over the public guardian's objection.

¶ 43     In *In re J.J.*, 142 Ill. 2d 1, our supreme court held that "when the State moves to dismiss a petition alleging abuse of a minor, the circuit court shall consider the merits of the motion and determine, on the record, whether dismissal is in the best interests of the minor, the minor's family and the community." *Id.* at 9. The court further noted that, after hearing the evidence, if the circuit court determines, in the exercise of its discretion, that the best interests of the minor will be served by dismissal of the petition, it should allow the motion to dismiss. *Id.* at 11; *Ashli T.*, 2014 IL App (1st) 132504, ¶ 17; *In re Gustavo H.*, 362 Ill. App. 3d 802, 811 (2005); 705 ILCS 405/2-10(1) (West 2018).

¶ 44     As such, we review the court's decision to dismiss the petition under an abuse of discretion standard. A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would adopt its view. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23. An abuse of discretion standard of review is highly deferential to the trial court. *Id.*

¶ 45    Here, following an evidentiary hearing as prescribed by *J.J.*, the court found that Jason B. was not abused or neglected and dismissed the adjudication petition.

¶ 46    The Juvenile Court Act provides that a minor is neglected if his environment is injurious to his welfare. 705 ILCS 405/2-3(1)(b) (West 2018). Neglect is defined as the failure to exercise the care that circumstances justly demand and covers both willful and unintentional disregard of parental duties. *Ashley F.*, 265 Ill. App. 3d at 424. When making determinations of neglect, the trial court has wide discretion. The findings, which are based on the court's opportunity to observe the demeanor and conduct of the parties and witnesses, must be given great weight. *Id.* Moreover, its determination will not be disturbed unless it is against the manifest weight of the evidence. *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997). A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one. *Id.*

¶ 47    Turning to the merits of this appeal, based on our review of the record, we do not find that the trial court's determination that there was no probable cause of Jason B.'s abuse and neglect to be against the manifest weight of the evidence. As previously noted, the evidence presented at the hearing established that the State commenced proceedings on Jason B.'s behalf based on suspected physical abuse of D.B., who lived in the same household. Once there was medical evidence that negated some of the physical abuse allegations regarding D.B., the State moved to dismiss Jason B.'s adjudication petition.

¶ 48    At the evidentiary hearing, Dr. Torres gave substantial testimony regarding her examination and investigation regarding D.B., but was only able to testify to concerns regarding Jason B. made by the examining physician. Dr. Torres reviewed reports and photographs of marks on Jason B.'s chest and buttock, but was unable to conclusively state the cause of the marks. More importantly, Dr. Torres never examined Jason B. She further stated that she was unable to get a history of the marks because no caregiver was present, and Jason B. was nonverbal.

¶ 49    Rojas testified that she learned of a prior investigation concerning an allegation of physical abuse of Jason B. earlier in 2019 that was deemed unfounded. While Rojas testified that she was concerned because respondents-appellees and Regina hid Jason B. and lied about his whereabouts, there was no testimony as to any observations of physical abuse of Jason B. or any additional marks on him.

¶ 50    Rambo-Harris testified to her observations of Jason B., Taniya C., and Regina, noting that they seemed well bonded and had a loving relationship. She also testified that it was in Jason B.'s best interests to remain in the care and custody of his mother.

¶ 51    In making its determination that there was no probable cause of abuse or neglect as to Jason B., the trial court noted that the arguments in favor of probable cause were bootstrapped onto the claims of abuse as to D.B.

¶ 52    We agree. While the public guardian did present evidence of marks on J.B.'s buttock and chest, such evidence did not rise to the level of conclusively establishing abuse or neglect as there was absolutely no testimony presented establishing the cause of the marks. Even Dr. Torres's testimony was inconclusive, as she did not know if the marks on his chest were bruises or birth marks and that the mark on his buttock may have been linear. The evidence that there was a prior investigation of abuse, based on Ladale B.'s statement in May 2019 that he hit J.B. with a belt, did not conclusively establish that the mark observed in October 2019 was the

result of a belt. We conclude therefore that the trial court's finding that there was no probable cause of abuse or neglect as to J.B. was not against the manifest weight of the evidence.

¶ 53    It bears repeating that the only reason adjudication proceedings were commenced for Jason B. was the suspected abuse of D.B., who resided in the same household. Once a portion of D.B.'s suspected abuse was attributable to a medical condition, the trial court found that there was no longer any probable cause to support temporary custody of Jason B. Additionally, evidence presented at the hearing by the caseworker indicated that it was in the best interests of Jason B. to remain in the care and custody of his mother.

¶ 54    Once the court determined that there was no probable cause, it was obligated to dismiss the petition. See *Gustavo H.*, 362 Ill. App. 3d at 811. We give the trial court's determination great deference, as it was in the best position to view the parties and hear the evidence (*Ashley F.*, 265 Ill. App. 3d at 424), and we find that the trial court did not abuse its discretion in dismissing the petition for adjudication of wardship based on the evidence presented at the evidentiary hearing.

¶ 55                                    CONCLUSION

¶ 56    For the foregoing reasons, the judgment of the trial court dismissing the petition for adjudication of wardship is affirmed.

¶ 57    Affirmed.